UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

HERNANDO HALEY            CIVIL ACTION NO. 06-cv-1039

VERSUS            JUDGE HICKS

WARDEN WINN CORRECTIONAL            MAGISTRATE JUDGE HORNSBY
CENTER

**REPORT AND RECOMMENDATION**

**Introduction**

Hernando Cortez Haley ("Petitioner") was charged, along with two co-defendants, with aggravated burglary. Petitioner states in his petition that one co-defendant entered a plea of guilty to simple burglary and received a sentence of five years. The second co-defendant had a jury trial and was found guilty of aggravated burglary and received a 30-year sentence. Petitioner pursued a third route, a bench trial before Judge Jeanette Garrett, but he was also found guilty of aggravated burglary. Petitioner was adjudicated a third-felony habitual offender, and he received an enhanced sentence of 30 years.

Petitioner argued on direct appeal that the evidence was insufficient to support his conviction, that the State did not prove that proper Boykin advice was given with respect to the prior convictions used to enhance the sentence, and that the sentence was excessive. State v. Haley, 873 So.2d 747 (La. App. 2d Cir. 2004), writ denied, 904 So.2d 728 (La. 2005). Petitioner's writ application to the Supreme Court of Louisiana raised only the sufficiency of the evidence claim. Tr. 401-10. Accordingly, Petitioner did not exhaust his

state court remedies with respect to the other two claims through the direct appeal process. O'Sullivan v. Boerckel, 119 S.Ct. 1728 (1999). The court gave Petitioner an opportunity to elect how to proceed in light of that deficiency. Doc. 8. Petitioner elected to dismiss his unexhausted claims and proceed only with the sufficiency of the evidence claim. Docs. 15 and 19. The State was ordered to respond to the sufficiency claim, and it has filed a brief.

**The Relevant Evidence**

Fourteen-year-old Chase Barnhill testified that he was alone at the home of his grandparents, Deputy Danny Wilburn and Bonnie Wilburn, when he heard a knock at the door. Chase looked out the peephole and saw a black male at the door and a black Caprice with tinted windows. He called his grandmother, who was at her nearby business, to see if she sent someone to the house to check on him, but Bonnie Wilburn did not answer the phone. The doorbell then began to ring repeatedly, and someone started banging on the door. Chase hung up the phone and began to dial 911, but after he dialed the second digit, someone broke down the front door of the house. Chase immediately ran out the back door, jumped the fence, and ran to his grandmother's nearby sandwich shop.

Chase told his grandmother that someone was breaking into her house. He recalled this his grandmother called her husband or 911 or both, and then Chase and his grandmother ran out the front door, got in the car, and drove to the house. They saw the black Caprice leaving the driveway, and they followed it. As they passed the house, they noticed that the front door was kicked in. Bonnie had Chase get a piece of paper. Bonnie was able to call

out the license plate number of the black car, and Chase wrote it down. At one point, Chase recalled, the black car pulled in a driveway, and Bonnie pulled in the driveway next to them. The car sat there for a couple of seconds, then the black car backed up and went back the way it had come from. Bonnie and Chase continued to follow the black car, which was driving fast.

Bonnie and Chase saw a police car coming their way, so they broke off their pursuit, turned around and followed the police car back to Bonnie's house. They told the police what they had seen, and a radio dispatch was made to look for the black Caprice. Chase testified that items stolen from him included a PlayStation, Fossil watch, and $15. Chase identified a picture of the black Caprice and recognized its license plate number. He also pointed out items of property that were stolen from him and his grandparents that could be seen in the backseat and on the back floorboard of the car. Chase admitted that the windows of the car had been tinted so dark that he could not see inside it. He also admitted that he never saw who or how many people came into the house. Tr. 183-93.

Bonnie Wilburn testified that she immediately called 911 after Chase reported the break-in, and she asked a person at the store next door to call her husband, Sgt. Wilburn. She testified that she actually blocked the black car in a driveway where it stopped, and she called out the license plate number twice so that Chase could write it down. Chase told her to get out of there because the people in the black car had guns, so she pulled into the next driveway. Mrs. Wilburn admitted that she could not see the men in the car or even tell how

many men were inside, because the tint on the windows was so dark. When they left the driveway, the men were driving "very fast" and running stop signs. Mrs. Wilburn said she followed the Caprice until she saw a police car driving towards her house, when she turned around and followed the police. The minute Mrs. Wilburn and Chase got out of the car, Chase handed a police officer the paper with the license number on it. The officer immediately called and alerted other officers to the information about the car. Mrs. Wilburn saw that the burglars had stolen her Direct TV system, her surround sound system, VCRs, a telephone answering machine, and the PlayStation. Several guns were taken from a gun rack and from under a bed. Tr. 194-205.

Danny Wilburn, a sergeant with the Caddo Parish Sheriff's Office, testified that he got a call to alert him that his house had been burglarized. He left work to come home. On the way, he received a call to tell him that the suspects had been arrested on Linwood Avenue at the Church's Chicken. Wilburn drove to the scene, and he saw the three men who had been arrested, including Petitioner.

Wilburn testified that he kept deer rifles and shotguns in his home. One or two of the weapons were kept loaded, and one of the loaded weapons was taken during the burglary. Sgt. Wilburn viewed photographs of the backseat area of the black Caprice and identified several items of property, including firearms and ammunition, that were taken from his house. Wilburn testified that he thought a 12-gauge single-barrel shotgun was loaded when it was taken. Tr. 205-12.

Lt. Kenneth Jackson of the Shreveport Police Department testified that he saw the black car as he sat at a red light. He had heard the recent radio alerts regarding the car. He began to follow it. Jackson admitted that he had a hard time seeing through the tinted windows on the rainy day, but he said as cars approached he could see inside at times with the aid of their headlights. He first thought there were two persons inside, but he eventually made out that there were three people in the car. Jackson broadcast over the radio that they were "three deep" in the car. Jackson followed the car, which was traveling at the posted speed limit, but because he did not have a light bar, he stayed back and radioed information to other officers. Other units did respond, and when they were in place they signaled the black car to stop. While the black car was still rolling, the back passenger door quickly opened, and a black male exited and ran. After the car came to a stop, the other two suspects got out when they were ordered to do so. Jackson testified that the distance between where Mrs. Wilburn stopped following the black car and where he saw it was about four to four and a half miles. The time of various radio communications indicated that approximately four minutes passed between those two events. Tr. 216-30.

Cpl. David Walls testified that he saw the black male jump out of the back seat of the car, and he gave chase. He identified Petitioner in the courtroom as that man. Tr. 231-37. Cpl. Walls suffered a hamstring injury and had to drop out of the chase, but Officer F. P. McConnell was able to eventually flush the rather determined suspect from behind some houses. After several tense moments of verbal commands at gunpoint,

McConnell was able to take the suspect into custody. McConnell identified Petitioner as the man he arrested. Tr. 237-43.

Detective Kevin Goodwin testified that he searched the Caprice after the arrest. The firearms and ammunition were taken from the trunk of the car. One of the shotguns had ammunition on a belt around the stock (for easy access), but Goodwin did not recall that any of the weapons actually had rounds in the chamber. The crime scene investigator was unable to gather fingerprints from any of the items, which Goodwin attributed to texture of the items and too much fingerprint dust on at least one item. There was testimony about a shoe print on the front door of the burglarized house, but Goodwin said that no attempt was made at a shoe print comparison. Tr. 249-55.

**State Court Rulings**

Petitioner was charged with aggravated burglary, which La.R.S. 14:60 defined as "the unauthorized entering of any inhabited dwelling ... where a person is present, with the intent to commit a felony or any theft therein, if the offender:

      (1)    is armed with a dangerous weapon; or

      (2)    after entering arms himself with a dangerous weapon; or

      (3)    commits a battery on any person while in such place, or in entering or leaving such a place."

Judge Garrett, the trial judge, ruled that the State had proved the elements of aggravated burglary beyond a reasonable doubt. She made a "specific finding" that Chase Barnhill was in the house at the time of the unauthorized entry. She next found that a burglar

or burglars became armed with a dangerous weapon after entering. She cited Louisiana jurisprudence that establishes that the theft of dangerous weapons within the household satisfies that element of the crime. She accepted Sgt. Wilburn's testimony that he kept the 12-gauge single-barrel shotgun loaded, to the extent the law required a weapon to be loaded to be considered a dangerous weapon. She also accepted the testimony of the officers that Petitioner was arrested after he fled the same car that was involved in the burglary a few minutes earlier. The judge found it "totally unreasonable that this defendant got in the car some time after the burglary occurred and before the chase began" a few minutes later. The judge also found that Petitioner's flight and refusal to stop despite orders to do so was indicative of guilt. Tr. 265-68.

The state appellate court reviewed the evidence at length. It noted the statutory definition of aggravated burglary, as well as the statutory provision in La.R.S. 14:24 that all persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals and deemed equally guilty of the crime.

The appellate court deferred to the trial judge's credibility assessments. The court noted the compressed time frame between the crime and the traffic stop (and Petitioner's immediate flight), and agreed with the trial court that it was an "extremely unlikely alternative hypothesis" that two men burglarized the Wilburn house and then just happened to pick up an innocent Petitioner afterwards, some time between when Mrs. Wilburn stopped

tailing the car and when the police began to follow it. Only about four minutes passed during which time the fleeing burglars could have picked up Petitioner, a suggestion the court found "unworthy of belief." As for the arming element, the appellate court cited Louisiana jurisprudence that recognizes that stealing a dangerous weapon satisfies the element of "arming himself." State v. Haley, 873 So.2d at 748-52, citing State v. Hall, 796 So.2d 164 La. App. 2d Cir. 2001) ("The second tier of requirements may be satisfied by ... a perpetrator who arms himself (steals a dangerous weapon) during the offense").[1]

**Analysis**

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). The trier of fact has broad discretion to "resolve conflicts in testimony, to weigh evidence, and to draw reasonable

---

[1] In State v. Delagardelle, 957 So.2d 825 (La. App. 5th Cir. 2007), a conviction for aggravated burglary was affirmed in a case where the burglar took a knife from the kitchen counter and carried it to a bedroom. As in this case, the person inside the home ran away as soon as the burglar entered the home. The police found the knife near a closet where they discovered the burglar. There was no evidence the burglar displayed the knife to anyone, used the knife in a threatening manner, or otherwise actually used it as a weapon. No witness even saw the knife in the burglar's hand, but it was proved by circumstantial evidence that the burglar possessed the knife while in the home. The conviction was affirmed over a sufficiency of the evidence challenge that raised the "after entering arms himself with a dangerous weapon" issue. The defendant filed a federal habeas petition that raised the same issue. Relief was denied on the merits. Delagardelle v. Tappin, 2008 WL 2951219 (E.D. La. 2008).

inferences from basic facts to ultimate facts." Id. The Jackson inquiry "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 113 S.Ct. 853, 861 (1993).

The Louisiana appellate court invoked, recited and applied the Jackson standard on Petitioner's direct appeal, so its decision was not "contrary to clearly established Federal law," and Petitioner can obtain habeas relief only if the State court's decision was an "unreasonable application" of Jackson. 28 U.S.C. § 2254(d); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000); Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001).

Under the unreasonable application clause, a federal court is permitted to grant the writ if the state court has identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied that principle to the facts of the prisoner's case. Williams, 120 S.Ct. at 1523. Even if the federal court, in its independent judgment, has a firm conviction that the state court was incorrect in its application of a federal constitutional principle, that alone does not permit the federal court to grant habeas relief. Relief is not permitted unless the state court decision was so wrong as to be objectively unreasonable. Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003). And it is only the state court's ultimate decision, not the quality of its analysis or opinion, that is at issue. Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002)(en banc).

Petitioner argues to this court that his flight could be explained by his knowledge of warrants for his arrest. He also continues to press the theory that he might have innocently caught a ride with the burglars after the crime. This court does not sit to judge the evidence anew. It is limited to determining whether the state court's decision was an objectively unreasonable application of Jackson. Petitioner has offered arguments that are possible but highly unlikely under the evidence, and they were rejected by the state courts. This court cannot say that the state court's decision was so wrong as to require the conviction to be vacated. This court has carefully reviewed the trial evidence, considered the state court decisions, and found those decisions to be reasonable. No more analysis is required to recommend that the petition be denied.

Accordingly;

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be **denied**, and that Petitioner's complaint be **dismissed with prejudice**.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 31st day of March, 2009.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE